FILED
IN CLERK'S OFFICE
U S DISTRICT COURT E.D.N.Y.
★ SEP 3 0 2011 ★
BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
YOUTH ALIVE, CANDACE ROJAS, and
DAVID DAVILA,

                    Plaintiffs,

-against-

HAUPPAUGE SCHOOL DISTRICT, BOARD
OF EDUCATION OF THE DISTRICT,
PATRICIA LESSER, *Board Member*, ANN
MACALUSO, *Board Member*, STEVE
BURTON, *Board Member*, EILEEN MASS,
*Board Member*, GERI RICHTER, *Board
Member*, ROBERT SCHNEBEL, *Board Member*,
GINGER TODARO, *Board Member*, PATRICIA
SULLIVAN-KRISS, *Superintendent*,
CHRISTINE O'CONNOR, *Principal*, and
MICHAEL CAULIN, *Assistant Principal*,

                    Defendants.
------------------------------------------------------------X

**MEMORANDUM & ORDER**

08-CV-1068 (NGG) (ALC)

NICHOLAS G. GARAUFIS, United States District Judge.

    Plaintiffs Candace Rojas ("Rojas") and David Davila ("Davila") are founding members of Youth Alive, an extracurricular student Bible club at Hauppauge High School ("HHS" or "the school"). Rojas, Davila, and the Youth Alive organization bring this action pursuant to 42 USC § 1983 and the Equal Access Act, 20 USC § 4071 against Defendants Hauppauge School District, its Board of Education, and the above-captioned school district officials, asserting that Defendants denied them the right to organize and meet at HHS in violation of the Equal Access Act and the First and Fourth Amendments to the United States Constitution. Plaintiffs seek a permanent injunction and declaratory relief requiring Defendants to provide Youth Alive with "official recognition and approval" which, Youth Alive claims, must include a paid staffer to supervise Youth Alive meetings. Plaintiffs also seek nominal damages as to past school actions

1

relating to Youth Alive's initial creation and its access to the HHS website and the student club bank account.

The parties now cross-move for summary judgment on Plaintiffs' injunctive and declaratory relief claims. Plaintiffs also move for summary judgment on Plaintiffs' claims for nominal damages. (Def's Mot. for SJ. (Docket Entry # 43; Pl's Mot. for SJ. (Docket Entry # 49).)

For the reasons set forth below, Defendants' Motion is GRANTED in part and DENIED in part, and Plaintiffs' Motion is DENIED.

I. **FACTUAL BACKGROUND**

Plaintiff Candace Rojas founded Youth Alive, a student organization originally called the Bible Club, while attending HHS from 2005 to 2007. (Compl. (Docket Entry # 1) pgs. 3, 6.) She served as club president during the 2006-07 school year. (Joint Statement of Undisputed Facts (Docket Entry # 48) ¶ 12.) Plaintiff David Davila was a student at HHS, and served as the president of Youth Alive in the 2007-08 school year.[1] (Id. at ¶ 15.) They each profess to be adherents of the "Christian faith." (Id. at ¶¶ 13, 17.)

Rojas first sought permission to form a Bible club at HHS from then-Assistant Principal Christine O'Connor ("O'Connor") around the end of January 2005; O'Connor denied the request, citing budgetary concerns.[2] (Id. at ¶ 36-37.) In late September 2005, Rojas renewed her

---

[1] The court notes that, presumably, David Davilia has now graduated from HHS, since the complaint alleges he was a senior in 2007-08. (Compl. at pg. 1.) Presumably, then, neither Rojas nor Davila are members of Youth Alive, an HHS *student* organization. See 20 U.S.C. 4071(c)(5) ("nonschool persons may not direct, conduct, control, or regularly attend activities of student groups.). Therefore, it will be helpful for Plaintiffs to brief the court on who currently represents Youth Alive, an unincorporated organization which may be the only plaintiff with standing to pursue the declaratory and injunctive relief sought.

[2] Rojas has testified that "basically [O'Connor] said you can't have a Bible club in the school because of the budget and because the school is too secular." (Dep. of Candace Rojas at 9.3-9.) O'Connor has denied making such

2

request to the HHS administration. (Id. at ¶ 41.) After some delays due to finding a volunteer advisor, determining whether they school board had to approve the advisor, and assigning a room to the new group, Youth Alive first met formally in November 2005. (Id. at ¶ 43-47.) Youth Alive's meetings were suspended from the start of the school year in 2006 until October 2006, while the HHS administration investigated whether the school would need to approve Youth Alive's volunteer monitor; other than that interruption, Youth Alive has met continuously since November 2005. (Id. at ¶ 51-53.) In the two school years before the instant motions were filed, Youth Alive has meet approximately weekly. (Id. at ¶ 77.)

Once Youth Alive was created, Rojas sought to put information about the organization on the HHS website. In January 2006 she gave a description of the organization to O'Connor so that HHS's technology staff could post the description on the HHS website. The information appeared on the website in February 2006. (Id. at ¶ 48-50.) Youth Alive also lacked access to the student club bank account until 2008, after it filed the instant suit. Youth Alive's officers had not asked for access to the bank account prior to filing suit. (Id. at ¶ 58-59.)

Until the 2008-09 school year the school board's only action regarding student organizations was to approve the stipends typically paid to club advisors. (Id. at ¶ 55.) During the 2008-09 school year, the school board began ratifying the charters of student clubs, which it did for Youth Alive. (Id. at ¶ 57.)

HHS has a general policy that student groups must be supervised while they meet. (Joint Statement of Undisputed Facts ¶ 60.) Usually, a student club has an advisor who supervises their meetings and is paid for his or her time doing so. (Joint Statement of Undisputed Facts ¶ 64.) Because HHS has concluded that it cannot pay Youth Alive's advisor without violating federal

---

a statement in her deposition, stating that her decision was made purely due to a school moratorium on new clubs. (Dep. of Christine O'Connor at 27.15-21, 11.11-17.)

law, Youth Alive meets under the supervision of a volunteer advisor. (Joint Statement of Undisputed Facts ¶¶ 61-64.)

## II. PROCEDURAL BACKGROUND

The Complaint in this action was filed March 14, 2008, and served on Defendants on March 27, 2008. (Docket Entry ## 1, 4.) Following a series of extensions of time to answer, Defendants moved to dismiss the Complaint in lieu of an answer on August 13, 2008. (Docket Entry # 17.) On April 6, 2009, the court granted in part and denied in part Defendants' Motion to Dismiss[3], and the parties commenced discovery. (Docket Entry ## 24, 25, 26.)

The parties engaged in discovery through approximately June 18, 2010, at which time the parties requested a pre-motion conference with the court in anticipation of filing cross-motions for summary judgment. (Docket Entry ## 33, 34.) At a pre-motion conference on September 8, 2010, the court observed that the docket did not reflect that Defendants had answered the Complaint, and stated that it was odd for the court to consider motions for summary judgment when the Defendants had yet to answer. Defense counsel stated that he believed that he had filed and served an answer and that he would be surprised if he had not; he promised to verify that he had filed and served an answer. The court granted the parties' requests to file motions for summary judgment and directed Defendants to submit the fully briefed motions to the court promptly after the parties served their final papers on each other by December 7, 2010.

On September 17, 2010, Defendants filed their Answer and served it on Plaintiffs. (Docket Entry ## 37, 38.) On October 4, 2010, Plaintiffs filed a Motion for Entry of Default and

---

[3] By order dated April 6, 2009, the court on dismissed as moot Plaintiffs' claims for injunctive and declaratory relief regarding the events surrounding Youth Alive's initial formation, its ability to post materials to the HHS website, and its access to the student organization bank account. (Mot. To Dismiss Op. (Docket Entry # 24) at 9.)

4

a supporting affidavit (Docket Entry # 39), and Defendants filed a letter in opposition to the entry of default on October 5, 2010 (Docket Entry # 40).

## III. DISCUSSION

### A. Standard of Review

A motion for summary judgment must be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In determining whether a genuine issue of material fact exists, "the court must draw all reasonable inferences in favor of the nonmoving party." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 149 (2000). Further, the burden of showing the absence of any genuine dispute as to a material fact rests on the movant. See Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970). A fact is material if its existence or non-existence "might affect the outcome of the suit under the governing law," and an issue of fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Rule 56 "mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). In such a situation, "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. at 323. A grant of summary judgment is proper "[w]hen no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight." Gallo v. Prudential Residential Servs., L.P., 22 F.3d 1219, 1224 (2d Cir. 1994).

The party opposing summary judgment is not entitled to rely on unsworn allegations in the pleadings, but must instead "show that there is admissible evidence sufficient to support a finding in her favor on the issue that is the basis for the motion." Fitzgerald v. Henderson, 251 F.3d 345, 360-61 (2d Cir. 2001). A " genuine issue [is not] created merely by the presentation of assertions that are conclusory." Patterson v. County of Onieda, N.Y., 375 F.3d 206, 219 (2d Cir. 2004).

### B. Consequences of Defendants' Late Answer

The court first addresses whether the court should deem the allegations in the Complaint as admissions due to a Defendants' technical default in not filing an answer on time. It is clear that Defendants defaulted on their obligation to timely answer the Complaint. Plaintiffs correctly observe that once the court denied Defendants' motion to dismiss in part, Federal Rule of Civil Procedure 12(a)(4)(A) required Defendants to answer the Complaint within "14 days after notice of the court's action." Consequently, Defendants' Answer was due in April 2009; Defendants did not file their Answer until September 17, 2010. (See Answer (Docket Entry # 37).)An entry of default is governed by Federal Rule of Civil Procedure 55(a), which provides: "When a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise, the clerk must enter the party's default." Nevertheless, Rule 55(c) states that "[t]he court may set aside an entry of default for good cause . . . ."

The Second Circuit has directed district courts to consider three criteria in determining whether good cause exists to set aside an entry of default: "(1) whether the default was willful; (2) whether setting aside the default would prejudice the adversary; and (3) whether a meritorious defense is presented." Powerserve International, Inc. v. Lavi, 239 F.3d 508, 514 (2d

Cir. 2001) (quotation omitted). "[T]he matter of whether to grant relief from the entry of a default is 'left to the sound discretion of a district court because it is in the best position to assess the individual circumstances of a given case and to evaluate the credibility and good faith of the parties.'" Id. (quoting Enron Oil Corp. v. Diakuhara, 10 F.3d 90, 95 (2d Cir. 1993)).

Plaintiffs' Affidavit in Support of their Motion for Entry of Default makes no allegation that Defendants' default was willful. (Docket Entry # 39.) To the contrary, at the September 8, 2010, pre-motion conference, Defendants' counsel repeatedly stated that he thought he had answered the Complaint, and would be surprised if he had not. Defendants' conduct in the litigation is also not suggestive of an improper motive in failing to timely answer. Indeed, Defendants filed and served their Answer shortly after the court pointed out that Defendants had yet to do so. Prior to filing the Answer, Defendants actively defended the case and participated in settlement discussions with Plaintiffs. Furthermore, the docket is replete with examples of both parties exchanging consent to requests for adjournments of court dates and requests for extensions of filing deadlines, courtesies commonly extended by adversaries litigating in good faith. (See, e.g., Mot. to Continue Status Conference (Docket Entry # 27).) It is clear that Defendants' default is, as Defense counsel says in his October 5, 2010 letter, nothing more than an unfortunate oversight. (Docket Entry # 40.)

The court also finds no reason to believe that Plaintiffs will be prejudiced by setting aside the Entry of Default. Until the court observed that Defendants had failed to answer on September 8, 2010, there was no indication that Plaintiffs had ever mentioned Defendants' default or actively sought Plaintiffs' Answer. In all probability, had the court not pointed out the default, it is unlikely the parties would have noticed it themselves. Indeed, no party appears to have raised the issue in the seventeen months between the date the Answer was due and the date

7

it was actually filed and served. Furthermore, as Defendants observe in their letter, the Answer asserts no affirmative defenses and merely responds to the allegations in the Complaint. Moreover, Defendants have made clear their denials of the Complaint's factual allegations in the affidavits attached to Defendants' motion to dismiss. (Docket Entry # 17.) Thus, Plaintiffs cannot be said to have suffered any prejudice from the need to respond to new defenses or legal theories asserted for the first time in the Answer. The Court finds that Plaintiffs will suffer no prejudice if the court sets aside the entry of default.

Finally, the court notes that Defendants have vigorously defended this litigation and have already obtained favorable rulings in the court's Order granting in part their Motion to Dismiss and now, as discussed below, partial summary judgment. This further weighs in favor of excusing the default, as Defendants can show a meritorious and vigorous defense to the lawsuit, despite the technical default. The court thus agrees with the Clerk of Court's refusal to enter a notation of default, determines that Defendants' default is excused for good cause, and disregards those portions of Plaintiffs' submissions wherein Plaintiffs assert that Defendants are deemed to have admitted the factual allegations of the Complaint.

C.  **Cross-Motions for Summary Judgment on Equal Access Act Claim**

Plaintiffs and Defendants have cross-moved for summary judgment on Plaintiffs' claim for declaratory and injunctive relief under the Equal Access Act, 20 U.S.C. § 4071. The Equal Access Act is meant to guarantee equal access for and eliminate discrimination against religious and political student organizations in federally funded public schools. See Generally, Bd. of Educ. v. Mergens, 496 U.S. 226 (1990). Equal access and discrimination are not defined in the statute, but the legislative history suggests that "equal access" means "religiously oriented student activities of an extracurricular nature would be allowed under the same terms and

conditions as other extracurricular activities," and discrimination is "the denial of permission for students to engage in voluntary extracurricular activities that include prayer or religious speech when a school permits students to meet for non-religious extracurricular speech," including "harassment or unequal penalties as well as clearcut [sic] denial" of permission to meet. S. Rep. No. 93-357 (1984), reprinted in 1984 U.S.C.C.A.N. 2348, 2385.

Plaintiffs claim that Defendants' insistence on providing an unpaid monitor, instead of a paid advisor, constitutes denial of equal access and discrimination, in violation of § 4071(a). The parties agree that Hauppauge High School meets all the "triggers" for the application of the Act: it is a public secondary school that receives federal financial assistance, and it has created a limited open forum for non-curriculum-related student groups. (See Joint Statement of Undisputed Facts ¶¶ 31-33, 70-71.) However, even though the Act applies to the school, the Act also includes limitations that constrain its reach. Specifically, "nothing in [the Act] shall be construed to authorize . . . any state or political subdivision thereof . . . to expend public funds beyond the incidental cost of providing the space for student-initiated meetings . . . ." § 4071(d)(3). Here, neither party disputes that the school district is a political subdivision of the state of New York, and that Plaintiffs' requested relief would require the School District to expend public funds. The question of the legality of the Defendants' action turns on whether a paid advisor is an "incidental cost" of providing an after-school meeting place and time for Youth Alive.

Because the Equal Access Act does not define "incidental cost," the court interprets "incidental" as the Second Circuit did in Barton Mines Corp. v. Commissioner: Something is incidental if it "must occur in subordinate conjunction" with something else, and is "the

9

coincidental and secondary result" of that something else.[4] 446 F.2d 981, 991-92 (2d Cir. 1971). Under that definition, the Equal Access Act only requires a school to expend public funds if the public funds are costs that must occur in subordinate conjunction with, and as a secondary result of, providing the space for a group to meet. § 4071(d)(3).

It is clear from the record that a paid advisor is not a cost that must occur as a result of providing space for a group to meet in Hauppauge School District. As Plaintiffs point out, it is the usual practice for the school to require a paid advisor. (Joint Statement of Undisputed Facts ¶¶ 60-64.) However, the school has made an exception for Youth Alive. (Id.) The "incidental cost" that Plaintiffs point to—a paid advisor—is one that exists only because of the School District's policies, and, therefore, is a cost that can be incidental or non-incidental, depending on whether the School District alters its policies or not. If the School District were to require all groups to have a paid advisor, then stipends for advisors would be an incidental cost. If the School were to require that all groups have unpaid monitors, or that some groups not have paid monitors, or that groups not have monitors at all, then an advisor's stipend would not be incidental to meeting in the school. As the facts of the record make clear, the School District has altered its policies at least toward this group, by requiring an unpaid rather than paid monitor. (Id.) A one-group exception or alteration might raise Constitutional concerns, see Parts III.D. & E infra, but nothing in the text of the Equal Access Act requires that incidental costs be uniform as to all groups. The School District's change in its rules to allow Youth Alive to meet with an unpaid monitor, means that an advisor's stipend is not a necessary, subordinate cost of meeting. Therefore, because the Plaintiffs' claim for a paid advisor, if granted, would require expending

---

[4] Plaintiffs urge the court to refer to an additional definition of "incidental" discussed in Barton Mines: Something related to a larger process "so long as its cost is insubstantial in relation to the cost" of the larger process. Barton Mines, 446 F.2d at 992. However, the Plaintiffs misunderstand the Second Circuit's opinion when they cite to this second definition of incidental. The circuit states explicitly that the additional definition was not part of the common meaning of incidental and was used in Barton Mines because of a particular Treasury Department regulation applicable to that case. Id. Reliance on this second definition is not appropriate in the instant case.

public funds beyond what is an incidental—that is a necessary and subordinate—cost of the meeting, the Equal Access Act cannot be construed to require the School District to provide a paid advisor to Youth Alive.[5] Therefore, the court grants summary judgment to Defendants on Plaintiffs' Equal Access Act claim for declaratory and injunctive relief.

### D. Cross-Motions for Summary Judgment on Plaintiffs' First Amendment Claims

Plaintiffs and Defendants have cross-moved for summary judgment on Plaintiffs' First Amendment Free Exercise and Free Speech claims.

#### 1. Free Exercise

The Free Exercise Clause of the First Amendment shields individuals from government action intended to discourage the individual from practicing her religion; it "forestalls compulsion by law of the acceptance of any creed or the practice of any form of worship" and "safeguards the free exercise of [a person's] chosen form of religion. Cantwell v. Connecticut, 310 U.S. 296, 303-04 (1940). "[I]t is necessary in a free exercise case for one to show the coercive effect of the enactment as it operates against him in the practice of his religion." Abington School Dist. v. Schempp, 374 U.S. 203, 223 (1963). Indeed, the Supreme Court has at times required a plaintiff alleging a Free Exercise claim to show a substantial burden on the plaintiff's religious practices. Sherbert v. Verner, 374 U.S. 398, 402-03 (1963). The substantial burden test was rejected by the Court in Employment Division, Department of Human Resources v. Smith, 494 U.S. 872, 883-885 (1990), at least when a plaintiff is challenging a facially neutral law. The exact status of the Sherbert test in other situations is unclear, see Ford v. McGinnis, 352 F.3d 582, 592 (2d Cir. 2003), and the court need not resolve it in this situation. Nonetheless,

---

[5] The court is aware that the Equal Access Act has been interpreted broadly to protect religious groups in several cases. See Board of Educ. v. Mergens, 496 U.S. 226 (1990); Hsu v. Union Free School Dist., 85 F.3d 839 (2d Cir. 1996). However, these cases are distinguishable in that the plaintiffs in those cases did not seek relief that would have required the expenditure of public funds, in violation of the Equal Access Act's limiting clause.

11

what is clear is that a plaintiff must show at least *some* burden on her ability to practice her religious belief to be successful on a Free Exercise claim.

Plaintiffs argue that an unpaid club advisor has and will continue to burden their religious exercises because an unpaid advisor will cancel meetings at rate greater than that of a paid advisor, and thus, Plaintiffs will not be able to meet and express their religious beliefs. (Dep. of Stephanie Rojas (Docket Entry 53.2) at 11.1-5.) The undisputed facts about the frequency of Youth Alive's meeting are that it has met approximately weekly in the 2008-09 and 2009-10 school years, the last two full school years before the cross-motions were fully briefed. (Joint Statement of Undisputed Facts ¶ 77.) Principal O'Connor also testified that when the usual volunteer advisor cannot attend the Youth Alive meetings, she or another staff member supervises the meeting so that it is not cancelled (Dep. of Christine O'Connor at 44), and Plaintiffs stipulated to this fact. (Joint Statement of Facts ¶ 62). In Stephanie Rojas's deposition, however, she claimed that during the two-year period in which she participated in the club, the unpaid advisor did not show up at least three times and the club had to cancel its meetings on each of those occasions. (Dep. of Stephanie Rojas at 11.11-15.) Even accepting Rojas's statement as true, this fact does not create a genuine issue as to whether Plaintiffs are burdened by the unpaid status of their monitor. Club meeting cancellations are part of the student club reality, regardless of the status of the advisor. It is an undisputed fact that when a paid advisor does not attend his or her assigned club's meeting, the meeting is cancelled. (Joint Statement of Undisputed Facts ¶ 63.) Plaintiffs offer only supposition, without any evidence, when they claim that a paid advisor would be less likely to cancel meetings than an unpaid advisor. (See Pls. SJ Mot. pgs. 9-10.) On the factual record presented, there is no genuine issue as to whether Plaintiffs' freedom to express their religious beliefs are burdened at all (substantially or

12

otherwise) by being assigned an unpaid instead of a paid advisor. Therefore, the court grants summary judgment to Defendants' on Plaintiffs' Free Exercise claim for declaratory and injunctive relief.

2.  Free Speech

A similar analysis dictates the outcome to Plaintiffs' Free Speech claim. The Free Speech Clause of the First Amendment acts as a prohibition on viewpoint discrimination, where a school has opened a forum for student groups; once a school has accommodated some student groups, it may not punish or prohibit other student groups based on the content of their speech. See Widmar v. Vincent, 454 U.S. 263, 267 (1981). HHS has created a forum for its students by allowing extracurricular student groups (Joint Statement of Undisputed Facts ¶ 70), and therefore the school may not deny access to would-be users of the forum on the basis of their viewpoints, see Prince v. Jacoby, 303 F.3d 1074, 1091 (9th Cir. 2003) (citing Widmar, 454 U.S., at 269 (1981)).[6] Youth Alive is able to meet like other student groups, and, as discussed above, there is no fact in the record that suggests that a paid advisor would give Youth Alive greater ability to meet than it has now. All the evidence suggests that Youth Alive's members are able to use the forum—that is the school—to express their viewpoints as effectively as any other student group. Therefore, there is no genuine issue as to whether their free speech rights have been abridged, and the court grants summary judgment for the Defendants on the Plaintiffs' Free Speech claim for injunctive and declaratory relief.

---

[6] In Jacoby, the defendant school system denied access to various generally available items in ways that impacted plaintiff student's ability to use the forum for speech: for example, other groups could use school supplies and a/v equipment for their meetings, but the plaintiff's organization could not. 303 F.3d at 1090-91. The Jacoby facts contrast with the facts here, because here there is no evidence offered to suggest that the Plaintiffs' ability to express themselves is less than that of other groups.

### E. Cross-Motions for Summary Judgment on Plaintiffs' Equal Protection Claim

Plaintiffs and Defendants have cross-moved for summary judgment on Plaintiffs' Equal Protection claim. "[A]ny classification which serves to penalize the exercise of [a constitutionally protected right], unless shown to be necessary to promote a compelling governmental interest, is [an] unconstitutional" violation of the Equal Protection Clause of the Fourteenth Amendment. Dunn v. Blumstein, 405 U.S. 330, 339 (1972). To succeed in their Equal Protection claim, Plaintiffs must show "adverse treatment of individuals compared with other similarly situated individuals [and that] such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." Miner v. Clinton County, 541 F.3d 464, 474 (2d Cir. 2008) (quoting Bizarro v. Miranda, 394 F.3d 82, 86 (2d Cir. 2005)).

For this claim, however, the court finds that the parties' briefing has been less than helpful. As discussed above, there is no genuine issue of fact as to whether Plaintiffs are burdened by being assigned an unpaid advisor instead of a paid one. The club is able to meet on a weekly basis and does not face a higher risk of cancellation than other clubs. However, what remains unclear to the court is whether a plaintiff may win on an Equal Protection claim when there is no evidence of adverse results from the defendant's challenged treatment—i.e., whether a plaintiff needs to show only that two groups are classified differently, without showing that the classification has any material effect on the plaintiff. Therefore, neither party has shown that it is entitled to judgment as a matter of law; the court denies both parties' motions for summary judgment without prejudice, and instructs the parties to file supplemental briefing on any cases which have addressed whether an Equal Protection plaintiff need only show that she has been

classified differently than a similarly situated group, or if she must also show that the challenged classification has had an observable "adverse" effect.

### F. Plaintiffs' Motion for Summary Judgment on Nominal Damages Claim

While the status of the faculty monitor is the only live controversy between the parties in this case, Plaintiffs have preserved a claim for nominal damages flowing from alleged violations of their Free Exercise, Free Speech, and Equal Protection rights during the initial formation of the organization. Specifically, Plaintiffs claim their rights were violated because of (1) Defendants' initial reluctance to permit Plaintiffs' to form Youth Alive in 2005 (Joint Statement of Undisputed Facts ¶¶ 36-37, 41-43); (2) Defendants' delay in posting Youth Alive's materials on the school's website, in 2005-06 (Id. ¶¶ 48-50); and (3) Defendants' failure to tell Youth Alive that student organizations could deposit funds into a school-controlled bank account (Id. ¶¶ 58-59).

Plaintiffs have not met their burden in demonstrating that there is no genuine issue of material fact with regard to their claims for nominal damages. First, there is a genuine issue as to whether the delay in Youth Alive's formation was religiously motivated or based on purely neutral reasons. Rojas claims that O'Connor told her that the school district was "too secular" for Youth Alive. (Dep. of Candace Rojas at 9.3-9.) O'Connor has flatly denied this statement, saying that the only reason for the delay was a general moratorium on the creation of extra-curricular student organizations. (Dep. of Christine O'Connor at 11.11-17, 27.15-21.)

As for the other allegations—delays with the website and with the bank account—Plaintiffs have failed to meet their burden. Plaintiffs do not point to undisputed facts that show that any of Defendants' actions about the website or bank account were unusual or different from how other extracurricular groups were treated. Plaintiffs do not offer any evidence that would

15

demonstrate that extracurricular groups normally receive access to the student bank account system immediately, or that the information about other groups on the HHS website was updated more rapidly than Youth Alive's information. Without such evidence, it is impossible for Plaintiffs to show that they are entitled to judgment as a matter of law on their Equal Protection claim, which requires showing that members of a certain group, such as adherents of a certain religion, are treated differently than other similarly situated groups. Miner, 541 F.3d at 474. Nor can they show that they are entitled to summary judgment on their First Amendment claim, which requires a showing that Defendants engage in some behavior to penalize or discourage the adherents of a certain religion. See Schempp, 374 U.S. at 223. Plaintiffs have shown that they suffered from delays that face any group working with a large educational bureaucracy. As the factual record stands, however, Plaintiffs have not shown that Youth Alive was treated differently from other similarly situated groups or singled out for anything constituting punishment.[7] Accordingly, Plaintiffs' request for summary judgment on their nominal damages claims is denied.

---

[7] The only undisputed fact in the record about other student organizations at HHS is that Defendants approved one organization after denying Rojas's original request to create Youth Alive. (Joint Statement of Undisputed Facts ¶ 39.) However, that organization, Scholastic Opportunities for Academic Recognition, was not an extra-curricular organization; it was part of a curricular program and thus in a category of organizations different from Youth Alive. (Id. ¶ 40.)

## IV. CONCLUSION

Consistent with this opinion, the court GRANTS IN PART and DENIES IN PART Defendants' motion for summary judgment, DENIES Plaintiffs' motion for summary judgment, and orders briefing on the issue of equal protection. The parties shall propose a briefing schedule through a joint letter to the court.

SO ORDERED.

                                                                         s/Nicholas G. Garaufis

Dated: Brooklyn, New York                               NICHOLAS G. GARAUFIS
      September 30, 2011                                   United States District Judge